IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| R. WAYNE KLEIN, the Court-Appointed Receiver of U.S. Ventures LC, Winsome Investment Trust, and the assets of Robert J. Andres and Robert L. Holloway,<br><br>Plaintiff,<br><br>vs.<br><br>FUNDACION GUATEMALTECO AMERICANA and ROBERTO E. PENEDO,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:12-cv-00049-DN<br><br>District Judge David Nuffer |

This matter is before the court on Plaintiff R. Wayne Klein's ("the Receiver") Motion for Summary Judgment ("Motion").[1] After carefully considering the memoranda and evidence submitted by the parties as well as the law and facts relating to the Motion, the court determined the Receiver's Motion should be granted and directed preparation of a draft order.[2] An objection was made[3] and considered. This order grants the motion.

## Background

The Receiver seeks to recover funds sent by Winsome Investment Trust ("Winsome") to Defendant Roberto E. Penedo ("Penedo"). Penedo filed a motion for partial summary judgment on May 8, 2013 seeking a ruling limiting the Receiver's claim for damages against him to

---

[1] Docket no. 28, filed September 12, 2013.

[2] Docket Text Order, docket no. 37, entered January 7, 2014.

[3] Objection to Proposed Memorandum Decision and Order Granting Plaintiff's Motion for Summary Judgment, docket no. 38, filed February 6, 2014.

$197,000, the amount he admitted he received directly from Winsome.[4] The Receiver also filed a motion for partial summary judgment on September 12, 2013, seeking judgment that Penedo is liable for $197,000, the amount received directly from Winsome.[5]

On December 13, 2013, the parties entered into a stipulation and agreement whereby they agreed that Winsome operated as a Ponzi scheme and was insolvent at the time Winsome transferred $197,000 to Penedo.[6] The parties also stipulated that Penedo is not liable for the transfers from Winsome to Fundacion Guatemalteco Americana ("FundaGuam"), a foreign entity which is a defendant in this action but was never served.[7] The parties agreed that the Receiver could pursue a claim against Penedo for transfers Penedo received directly from Winsome in the amount of $197,000 (the "Transfers"), but the Receiver could not pursue Penedo for transfers made by Winsome to FundaGuam.[8]

On December 26, 2013, an order was entered accepting the stipulation and agreement.[9] As a result, Penedo's motion for summary judgment was withdrawn as moot, and the Receiver's Motion is the only motion pending and is properly considered a motion for summary judgment.

---

[4] Penedo's Motion for Partial Summary Judgment ("Penedo's Motion"), docket no. 21, filed May 8, 2013.

[5] Docket no. 28.

[6] Stipulation on Existence of Ponzi Scheme and on Damages Recoverable by the Plaintiff Against Robert E. Penedo ("Stipulation"), docket no. 32.

[7] *Id.*

[8] *Id.*

[9] Docket no. 33.

**Findings of Fact**

1. Winsome operated as a fraudulent Ponzi scheme and was insolvent at the time of the Transfers.[10]

2. Penedo knowingly received $197,000 in payments from Winsome accounts in direct wire transfers between October of 2006 and September of 2008.[11]

3. Penedo asserts that he provided "lobbying" services for a company called RIO Systems, Inc. ("RIO") in exchange for the Transfers. The lobbying was allegedly to aid RIO in building a refinery in Guatemala.[12]

4. Penedo asserts that the Transfers were made "as payment pursuant to [a] certain Refinery Agreement dated October 23, 2006 between RIO Systems, Inc., Mr. Penedo, and Fundacion Guatemalteco" (the "Refinery Agreement").[13] It is undisputed, however, that Winsome was not a signatory to the Refinery Agreement or even mentioned in it, and that the Refinery Agreement is a fully integrated agreement, which was amended many times by the parties. The Refinery Agreement provides that RIO was to make payments to Penedo.[14]:

5. Penedo also referenced a Memorandum of Understanding ("MOU") that was entered into by China Railway HuaChuang United Investment Co., Ltd., Pursca Investment

---

[10] *See* Stipulation, docket no. 32.

[11] *See* Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support ("Def.'s Opp.") at 7, docket no. 29, filed October 10, 2013.

[12] *See id.* at 3.

[13] *See* Plaintiff's Motion, Exhibit 2, Defendant Robert E. Penedo's Answers to Plaintiff's First Set of Discovery Requests at 7-8, docket no. 28-2, filed September 12, 2013.

[14] *Id.*; *see also* Plaintiff's Motion, Exhibit 4, Refinery Agreement at ¶ 1.1, docket no. 28-4, ("RIO shall provide, or cause one or more of its affiliates and/or subsidiaries to provide Penedo and/or FundaGuam … such funds as are set forth herein").

Group, Ltd., RIO, and FundaGuam in 2007 related to the Refinery project.[15] Like the Refinery Agreement, Winsome was not a signatory to the MOU.[16]

6. Penedo does not dispute that Winsome was not a signatory to any of the agreements pursuant to which Penedo claims he was owed payment.[17]

7. Both the Refinery Agreement and the MOU list the parties to them on their first pages, respectively, and identifies the signatories on their execution pages.[18] There is nothing in either agreement that casts doubt on the identity of the signatories or suggests that some other unnamed party may be obligated to make payments to Penedo.

8. The Refinery Agreement also provides by its express terms that the "Agreement is the complete, entire, final and exclusive statement of the terms and conditions of the agreement among the Parties," and that the "Agreement… may not be modified except in a writing…."[19]

9. The Refinery Agreement was amended many times in writing, and none of the amendments mention or refer to Winsome.[20]

10. RIO's owner, Clayton Lynn Ballard ("Mr. Ballard"), testified that RIO, FundaGuam, and Penedo are the only parties to the Refinery Agreement and that Winsome has never been affiliated with RIO.[21] Mr. Ballard also testified that in October of 2012, Penedo

---

[15] *See, e.g.*, Penedo's Motion at 5-6, docket no. 21.

[16] *See* Receiver's Opposition to Defendant Roberto E. Penedo's Motion for Partial Summary Judgment at vii, xix-xx, docket no. 22, filed June 10, 2013.

[17] *See* Def.'s Opp. at 9, 12, docket no. 29.

[18] *See id.*, Exhibits D and E, docket nos. 29-4 and 29-5, respectively.

[19] *Id.*, Exhibit E. at § 6.9, docket no. 29-5.

[20] *See* Amendments, attached as Exhibit B to Reply Memorandum in Support of Motion for Partial Summary Judgment, docket no. 30-2, filed October 28, 2013.

[21] *See* Plaintiff's Motion, Exhibit 5, Aff. of Clayton Lynn Ballard ("Ballard Aff.") at ¶¶ 7, 12, docket no. 28-5, filed September 12, 2013.

4

approached him and asked that he sign an affidavit stating that RIO had assigned its rights in the Refinery Agreement to Winsome, but Mr. Ballard refused to sign Penedo's affidavit because it was not true or accurate.[22]

11. Penedo asserts that RIO provided Robert Andres ("Andres"), the principal of Winsome, a promissory note for $20,256,000 that was given in exchange for Andres' role in, among others, the refinery project, and that as a result, Winsome had an incentive to pay Penedo to ensure that Andres would eventually receive payment on his promissory note.[23] Winsome is not a party to this promissory note, which shows, at most, that RIO owed a contingent debt to Andres, not to Winsome.

12. Mr. Ballard also testified at his deposition that "RIO does not owe anything to Winsome."[24]

13. Penedo has provided no evidence of any services he performed that benefited Winsome.

---

[22] *Id*. at ¶¶ 8-11.

[23] *See* Def.'s Opp. at 21, docket no. 29.

[24] *See* Plaintiff's Motion, Exhibit 6, Excerpts from Deposition of Clayton Lynn Ballard ("Ballard Depo.") at 20:3-24 (explaining that RIO previously entered into an agreement with Andres to pay him for his past services that predated the Refinery Agreement, but has no obligation to Winsome); 99:3-10 ("Q. As far as you know, under the Refinery Agreement, the Amendments to the Refinery Agreement, and the MOU, did Winsome Investment Trust have any obligation to anyone?" "A. No written obligations. Nothing under contract, no." "Q. There are no contractual obligations?" "A. No."); 62:21-22 ("Winsome had nothing to do with the agreement that RIO reached with Bob Andres"); and 69:4-6 ("Q. Did RIO Systems ever authorize Winsome Investment Trust to Act on its behalf?" "A. No"), docket no. 28-6, filed September 12, 2013.

**Standard of Review**

Summary judgment is proper if the moving party can demonstrate that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law.[25] The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.[26] To show that no genuine issue of material fact exists, the moving party has the initial burden of production to establish that summary judgment is appropriate as a matter of law.[27]

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[28] "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[29] Inferences are drawn in a light most favorable to the non-moving party.[30]

**Analysis**

In this action, the Receiver seeks to recover $197,000 in payments made by Winsome to Penedo. The Receiver filed a motion for summary judgment on his claims for actual fraudulent transfer, constructive fraudulent transfer, and unjust enrichment. Each cause of action is addressed.

---

[25] *See* Fed. R. Civ. P. 56(a).

[26] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

[27] *Pelt v. Utah,* 539 F.3d 1271, 1280 (10th Cir. 2008).

[28] *Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 971 (10th Cir. 2002).

[29] *Id.* at 972 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (10th Cir. 2002)).

[30] *See Matushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991).

1. **Actual Fraudulent Transfer**

Pursuant to Uniform Fraudulent Transfer Act ("UFTA"), a transfer is actually fraudulent and may be avoided if the debtor made the transfer with actual intent to defraud a creditor.[31] If a transferee can successfully demonstrate that the transfer was received in good faith and for reasonably equivalent value, he or she can establish an affirmative defense to an actual fraudulent transfer.[32]

   a. <u>Actual Intent to Defraud.</u>

"Courts have routinely applied [the] UFTA to allow receivers…to recover monies lost by Ponzi-scheme investors."[33] This is because the "Ponzi scheme operator is the 'debtor,' and each investor is a 'creditor.'"[34] One of the ways a receiver may recover under the UFTA is if the entity is placed in receivership, or the "debtor" transferred funds with the "actual intent to hinder, delay, or defraud" any of its creditors.[35] The "mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud" under the UFTA.[36]

Utah courts define a Ponzi scheme as "a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments."[37] In general, Ponzi schemes collapse on

---

[31] *See* Utah Code Ann. § 25-6-5(1)(a).

[32] *Wing v. Apex Holding Co.*, No. 2:09-CV-00022, 2009 WL 2843343, *5 (D. Utah Aug. 27, 2009).

[33] *Donell v. Kowell,* 533 F.3d 762, 767 (9th Cir. 2008).

[34] *Donell*, 533 F.3d at 767.

[35] Utah Code Ann. § 25-6-5(1)(a); *see also* Donell, 533 F.3d at 770.

[36] *Donell*, 533 F.3d at 770; *see also In re Cohen,* 199 B.R. 709, 717 (B.A.P. 9th Cir. 1996) ("Proof of a Ponzi scheme is sufficient to establish the Ponzi operator's actual intent to hinder, delay, or defraud creditors for purposes of actually fraudulent transfers . . ."); *Janvey v. Democratic Senatorial Campaign Committee*, 712 F. 3d 185, 196 (5th Cir. 2013) ("transfers from a Ponzi scheme are presumptively made with intent to defraud'"); *S.E.C. v. Madison Real Estate Group, L.L.C.*, 647 F. Supp. 2d 1271, 1279 (D. Utah 2009) ("Under the UFTA, a debtor's actual intent to hinder, delay, or defraud is conclusively established by proving that the debtor operated as a Ponzi scheme.")

[37] *State v. Bolson*, 2007 UT App 268, ¶ 4, 167 P.3d 539 (citing Black's Law Dictionary 1180 (7th ed.1999)).

themselves because the returns paid to investors are not based on returns from the underlying business venture but from the principal of other investors.[38]

Here, the parties stipulated that Winsome was acting as a Ponzi scheme at the time of the Transfers and therefore the Transfers were made with an actual intent to defraud in violation of the UFTA.[39] Penedo admits he received the Transfers.

  b. Reasonably Equivalent Value.

Because it is undisputed that the Transfers were made with actual intent to defraud, the only remaining issue is whether Penedo can raise an issues of fact as to the affirmative defense set forth in Utah Code Ann. § 25-6-9, which requires him to demonstrate that he received the Transfers in good faith and for reasonably equivalent value. The burden is on Penedo to prove both of these elements.[40]

Penedo has no proof that Winsome received reasonably equivalent value for the Transfers. Whether reasonably equivalent value was received is evaluated from the perspective of the tort creditors of Winsome, its defrauded investors.[41] In other words, the question is not whether Penedo "gave reasonably equivalent value; it is whether [Winsome] *received* reasonably

---

[38]*In re Hedged-Investments Associates, Inc.*, 48 F.3d 470, 471 n. 2 (10th Cir. 1995).

[39] *See* Utah Code Ann. § 25-6-5(1)(a).

[40] *See Wing v. Apex Holding Co.*, No. 2:09-CV-00022, 2009 WL 2843343, *6 (D. Utah Aug. 27, 2009) ("whether a defendant took payments from [Ponzi scheme receivership entity] in good faith and for reasonably equivalent value is an affirmative defense . . . ."); *see also Wing v. Holder,* 2010 WL 5021087 * 2-3 (D. Utah, December 3, 2010); *Terry v. June*, 432 F. Supp. 2d 635, 641-642 (W.D. Va. 2006); *cf. Barnard & Burk Group, Inc. v. Labor Com'n,* 122 P.3d 700, 704 (Utah Ct. App. 2005) (noting that defendant bore the burden of proving statute of limitation defense "[a]s with any affirmative defense").

[41] *In re Jordan*, 392 B.R. 428, 441 (Bankr. D. Idaho 2008) ("Whether a debtor received a reasonably equivalent value is analyzed from the point of view of the debtor's creditors, because the function of this element is to allow avoidance of only those transfers that result in diminution of a debtor's . . . assets."); *see also Donell*, 533 F.3d at 767 (explaining that, in a Ponzi scheme, the Ponzi scheme operator is the "debtor," and each good faith investor in the scheme who has not regained his initial investment is a "creditor").

equivalent value."[42] Penedo contends that he provided reasonably equivalent value to Winsome when he performed certain lobbying services under the Refinery Agreement signed by Penedo, RIO and FundaGuam. But neither the Refinery Agreement, nor its many amendments, mention Winsome, nor do they obligate Winsome to make payments to Penedo. Penedo admits that Winsome is not a signatory to that agreement. Nonetheless, Penedo argues that Winsome was obligated to make the payments at issue despite the fact that Winsome had no written agreement with Penedo.

Penedo's argument is based on alleged verbal agreements made by Mr. Ballard and Andres to Penedo. But Penedo's arguments fail because he has failed to present admissible evidence that creates genuine issues of fact as to whether Winsome received reasonably equivalent value in exchange for the Transfers.

> i. *Penedo has Failed to Provide Admissible Evidence that Winsome Received Reasonably Equivalent Value.*

Penedo's allegations that a verbal agreement obligated Winsome to pay Penedo or that Penedo provided value to Winsome are based on conclusory and self-serving statements, none of which create an issue of fact to defeat the Receiver's motion for summary judgment. Penedo claims that Ballard, RIO, Andres, and Winsome made statements that led Penedo to "understand" that Ballard, RIO, Andres, and Winsome had a prior agreement or relationship. Penedo cannot use these unsupported, conclusory allegations to escape summary judgment. The Tenth Circuit explained:

> Because the party opposing a motion for summary judgment must set forth specific facts to defeat the motion, [u]nsupported conclusory allegations ... do not create a genuine issue of fact. A conclusory affidavit from an expert witness is therefore

---

[42] *In re Lucas Dallas, Inc.*, 185 B.R. 801, 807 (9th Cir. 1995).

9

insufficient to defeat summary judgment. Similarly, mere speculation unsupported by evidence is insufficient to resist summary judgment.[43]

In *Lantec, Inc. v. Novell, Inc.*, the Tenth Circuit reiterated that an affidavit which is conclusory, vague, and/or lacking foundation is insufficient to support a finding that an agreement had been formed between the parties.[44] Although the plaintiff in *Lantec* provided an extensive deposition and affidavit in an attempt to prove the existence of an oral agreement, he failed to state how he learned of the alleged oral agreement at issue, who communicated the agreement to him, where the communication occurred, or what statements were made that created the oral argreement.[45] The Tenth Circuit found that the plaintiff did not allege any actual facts which demonstrated that an oral contract had existed for purposes of the plaintiff's summary judgment motion.[46]

Here, Penedo offers only conclusory speculation which fails to demonstrate any facts to support his position that Winsome was contractually obligated to pay Penedo. Although Penedo repeatedly claims that Andres, Ballard, RIO, and Winsome made representations that led him to believe that they had some unknown, prior relationship, he provides no further support for these claims and no detail about how he formed that belief. Nowhere in his affidavit does Penedo state what was actually said by whom, when it was said, or why he believes that such statements could bind Winsome to undertake the obligation to pay hundreds of thousands of dollars to Penedo under a contract to which it was not a signatory. He simply says that he understood that

---

[43] *Martinez v. CO2 Services, Inc.*, 12 Fed.Appx. 689, 694-695 (10th Cir. 2001) (internal quotations and citations omitted).

[44] 306 F.3d 1003, 1019 (10th Cir. 2002).

[45] *Id.*

[46] *Id.*

Winsome was "the money."[47] Other than Penedo's unsupported speculation, which is insufficient to defeat summary judgment, there is no evidence that Winsome had any obligation to make the Transfers.

There is also no evidence that Winsome received any benefit in exchange for the Transfers. Penedo claims that Winsome "received a benefit which was worth far in excess of what it actually paid to Mr. Penedo" because "Mr. Ballard, RIO, Mr. Andres, and Winsome all agreed that the lobbying and other services that Mr. Penedo provided were worth $4,000,000.00 up front, plus a 1% interest in the completed refinery project, plus reimbursement for all of Mr. Penedo's travel and other miscellaneous expenses incurred in carrying out those services."[48] Penedo fails to specify what benefit Winsome received from any lobbying or "other services" performed by Penedo, and whether Penedo even performed any services at all. Penedo provides no specific details whatsoever about his "lobbying" and "other services," except to state that he had "various connections and relationships …with many high ranking government officials and politicians in Guatemala."[49] This contention lacks foundation, is vague, and fails to address the key issue—what benefits did Winsome receive?

The only admissible evidence demonstrates that Winsome did not have any obligation to make the Transfers. RIO's owner, Mr. Ballard, testified that RIO, FundaGuam, and Penedo were the only parties to the Refinery Agreement and that Winsome has never been affiliated with RIO.[50] Mr. Ballard also testified that in October of 2012, Penedo approached him and asked that he sign an affidavit stating that RIO had assigned its rights in the Refinery Agreement to

---

[47] *See* Def.'s Opp. at 19, docket no. 29.

[48] *See id.* at 36-37.

[49] *See* Def.'s Opp., Exhibit A, Aff. of Roberto E. Penedo in Opposition to Plaintiff's Motion for Partial Summary Judgment at ¶ 18, docket no. 29-1, filed October 10, 2013.

[50] *See* Ballard Aff. at ¶¶ 7, 12, docket no. 28-5.

Winsome, but Mr. Ballard refused to sign Penedo's affidavit because it was neither true nor accurate.[51] While Penedo has claimed that RIO provided Andres a promissory note for $20,256,000, the fact that RIO may have owed Andres money does not prove that Winsome was contractually obligated to pay Penedo for services he allegedly performed for RIO. Mr. Ballard also testified at his deposition that "RIO does not owe anything to Winsome."[52]

Penedo has failed to offer any material evidence to dispute the Receiver's statements of fact. As a result, because it is undisputed that the Transfers were made by Winsome while it operated as a Ponzi scheme, and that Winsome did not receive any value from Penedo in exchange, the Transfers were actual fraudulent transfers under Utah Code Ann. § 25-6-5(1)(a).

> ii. *Penedo's Claims Fail Under the Statute of Frauds, Parol Evidence Rule, and the Integration Clause of the Refinery Agreement.*

Penedo's attempt to introduce evidence of oral agreements also fails under Utah law based on the statute of frauds, the parol evidence rule, and the integration clause in the Refinery Agreement. Utah's statute of frauds provides that "every promise to answer for the debt, default, or miscarriage of another" is void unless the agreement is in writing.[53] Under this section, even if Winsome agreed to pay RIO's debts and obligations under the Refinery Agreement, that agreement must have been in writing. No written agreement by Winsome to pay RIO's obligation has been introduced or admitted as evidence in this case.

---

[51] *Id*. at ¶¶ 8-11.

[52] *See* Ballard Depo. at 20:3-24 (explaining that RIO previously entered into an agreement with Andres to pay him for his past services that predated the Refinery Agreement, but has no obligation to Winsome); 99:3-10 ("Q. As far as you know, under the Refinery Agreement, the Amendments to the Refinery Agreement, and the MOU, did Winsome Investment Trust have any obligation to anyone?" "A. No written obligations. Nothing under contract, no." "Q. There are no contractual obligations?" "A. No."); 62:21-22 ("Winsome had nothing to do with the agreement that RIO reached with Bob Andres"); and 69:4-6 ("Q. Did RIO Systems ever authorize Winsome Investment Trust to Act on its behalf?" "A. No"), docket no. 28-6.

[53] Utah Code Ann. § 25-5-4(1).

Penedo argues that two of the exceptions to the statute of frauds set forth in Utah Code Ann. § 25-5-6(2) and (3) apply. Penedo contends that Winsome undertook an "original obligation" to pay Penedo for his lobbying services.[54] In addition to being unsupported by evidence of an actual obligation or debt owed by Winsome, Penedo's "original obligation" argument under either provision requires that, among other elements, Winsome receive some direct benefit from Penedo.[55] As discussed above, the undisputed facts demonstrate that Winsome did not receive any direct benefit from Penedo. Neither of the exceptions cited by Penedo apply, and the statute of frauds bars any claim that Winsome made a verbal agreement to pay Penedo.

The parol evidence rule also bars Penedo's claimed verbal modification of the Refinery Agreement. That rule prohibits a party from submitting extra-contractual evidence to alter the terms of a written contract unless the terms at issue are facially ambiguous.[56] "[W]hen parties have reduced to writing what appears to be a complete and certain agreement, it will be conclusively presumed, in the absence of fraud, that the writing contains the whole of the agreement between the parties."[57]

Here, the Refinery Agreement and MOU are unambiguous. They each list the parties involved on the first pages and clearly identify the signatories on the execution pages.[58] There is

---

[54] *See* Def.'s Opp. at 38-39, docket no. 29.

[55] *See, e.g.*, Utah Code Ann. 25-5-6(3) (providing that section applies where a promise is made "upon consideration beneficial to the promisor"); *Healthcare Services Group, Inc. v. Utah Dept. of Health*, 40 P. 3d 591, 596 (Utah 2002) (finding that statute of frauds might not apply under Utah Code Ann. § 25-5-6(2) "[w]here a promise is an original undertaking of the promisor for its own benefit").

[56] *See Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 11, 182 P.3d at 330.

[57] *Id.* at ¶ 12 (quotation omitted).

[58] *See* Def.'s Opp., Exhibit D, Memorandum of Understanding, and Exhibit E, Refinery Agreement, docket nos. 29-4, and 29-5, respectively, filed October 10, 2013.

nothing in either agreement to cast doubt on the identity of the signatories or to suggest that some other unnamed party may be obligated to make payments to Penedo. The agreements are facially clear and unambiguous, and Penedo's parol evidence will not be considered.

Penedo's attempt to change the written terms of the Refinery Agreement is also contrary to the express terms of the Refinery Agreement itself, which states that it "is the complete, entire, final and exclusive statement of the terms and conditions of the agreement among the Parties," and that it "may not be modified except in a writing…."[59] Contrary to its provisions, Penedo seeks to significantly alter the terms of the Refinery Agreement by adding an entirely new party and imposing on that party obligations expressly required of RIO. This is impermissible.

"A completely integrated agreement must be interpreted on its face, and thus the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document."[60]

### 2. Constructive Fraudulent Transfer

Pursuant to the UFTA, a transfer can also be avoided as a constructive fraudulent transfer if (1) "the debtor made the transfer…without receiving reasonably equivalent value in exchange" and (2) the transferor could not pay its debts as they became due.[61] Winsome did not receive reasonably equivalent value in exchange for the Transfers. Winsome's operation as a Ponzi scheme is evidence that it "intended to incur, or believed or reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due."[62] The Transfers were also

---

[59] *Id.*, Exhibit E, Refinery Agreement at § 6.9, docket 29-5.

[60] *Tangren,* 2008 UT 20 at ¶ 13 (citation omitted).

[61] Utah Code Ann. § 25-6-5(1)(b).

[62] *Donell,* 533 F.3d at 771.

constructively fraudulent under Utah Code Ann. § 25-6-5(1)(b).

3. **Unjust Enrichment Claim**

The Receiver seeks a judgment for unjust enrichment in the alternative based on the same facts that support his fraudulent transfer claim. A claim for unjust enrichment requires the plaintiff to satisfy three elements: (1) a benefit conferred on the defendant; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.[63]

Penedo failed to oppose the Receiver's motion for summary judgment on its unjust enrichment claim. Penedo's receipt of the Transfers satisfies the three elements to prevail on an unjust enrichment claim. Penedo plainly received a known benefit when he received the Transfers. Penedo's retention of that benefit is unjust because the money was derived from innocent investors' payments to a fraudulent Ponzi scheme, not actual investment gains, and because Penedo provided no benefit to Winsome in exchange for the Transfers. Under these circumstances, particularly where there are innocent investors who have suffered significant losses, Penedo's retention of the Transfers would be unjust.[64] Penedo is liable on the Receiver's unjust enrichment claim.

---

[63] *See Rawlings v. Rawlings*, 2010 UT 52, ¶ 29, 240 P.3d 754 (citing *Jeffs v. Stubbs*, 970 P.2d 1234, 1247-78 (Utah 1998)).

[64] *See In re Pearlman,* 472 B.R. 115, 125 (Bankr. M.D. Fla. 2012) (noting that "trustee has stated a valid cause of action that, if proven, defendants were unjustly enriched when they received payments to the extent they exceed defendants' original investment.")

## **ORDER**

IT IS HEREBY ORDERED that the Receiver's Motion for Summary Judgment[65] is GRANTED.

IT IS FURTHER ORDERED that Judgment is hereby entered against Defendant Penedo and in favor of the Receiver in the amount of $197,000, with post-judgment interest accruing at the legal rate.

Dated March 3, 2014.

BY THE COURT:

David Nuffer
United States District Judge

---

[65] Docket no. 28, filed September 12, 2013.